UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RHEUMATOLOGY DIAGNOSTICS LABORATORY, INC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>AETNA, INC., et al.,<br><br>Defendants. | Case No. 12-cv-05847-WHO<br><br>**TENTATIVE RULINGS ON MOTIONS IN LIMINE** |

Plaintiffs Hunter Laboratories, LLC ("Hunter") and Surgical Pathology Associates ("SPA") accuse defendants Quest Diagnostics Incorporated and Quest Diagnostics Clinical Laboratories Incorporated (collectively, "Quest") of selling lab tests at below-cost prices in violation of California's Unfair Practices Act ("UPA") and Unfair Competition Law ("UCL").  On July 2, 2015, the parties filed motions in limine in preparation for the trial set for August 17, 2015. To help the parties prepare for the pretrial conference tomorrow, I have set out my tentative rulings below.  I will hear argument on any motions that the parties wish to address.

## I. PLAINTIFFS' MOTIONS IN LIMINE

### 1. Plaintiffs' MIL No. 1: Exclude references to unrelated litigation involving Chris Riedel and Hunter

This motion is GRANTED. I address it further in my discussion of Quest's MIL No. 17.

### 2. Plaintiffs' MIL No. 2: Preclude the use of "price averaging" evidence

Plaintiffs seek to preclude Quest from offering evidence that its contracts, such as its contract with Aetna, Inc. ("Aetna"), were "profitable as a whole." Plfs. Mot. at 2 (Dkt. No. 321). Plaintiffs state that under *Fisherman's Wharf Bay Cruise Corp. v. Superior Court*, 114 Cal. App. 4th 309 (2003), such price averaging is irrelevant to whether an article or product was priced below cost within the meaning of the UPA. *See id.* at 326 (noting that "courts in state predatory

price cases brought under the UPA focus literally on whether the defendant sold 'any article or product' at less than cost;" holding that under this "individual item approach," courts analyze the sales at issue "based upon the actual below-cost prices charged for a product or service, without regard to whether other above-cost sales on identical or similar products made the overall enterprise profitable") (internal emphasis omitted).  Quest responds that the overall profitability of the Aetna contract is relevant to improper purpose and causation.  Quest Opp. at 2.

I agree with Quest.  Even assuming that *Fisherman's Wharf* makes evidence of the overall profitability of the Aetna contract irrelevant with respect to below-cost pricing itself, plaintiffs cite no authority indicating that such evidence cannot be considered with respect to improper purpose and causation.  This motion is DENIED.[1]

### 3. Plaintiffs' MIL No. 3: Exclude evidence regarding Hunter's alleged below-cost pricing

Plaintiffs move to exclude references to Hunter's alleged below-cost pricing on the ground that such evidence would be relevant only to Quest's unclean hands defense, which applies only to the nonjury issue of equitable remedies under the UCL.  Plfs. Mot. at 3.  Quest responds that certain instances of Hunter's below-cost pricing are relevant for reasons other than its unclean hands defense – e.g., to rebut causation with respect to the Aetna contract.  Quest Opp. at 6.

The instances of alleged below-cost pricing cited by Quest are not sufficiently probative of any relevant issue in this case to justify admission under FRE 403.  This motion is GRANTED.

## II. QUEST'S MOTIONS IN LIMINE

### 1. Quest's MIL No. 1: Exclude evidence relating primarily to claims that are no longer part of the case

Quest moves to exclude evidence relating "primarily" to claims that are no longer part of the case, in particular claims that were dismissed at summary judgment.  *See* Quest Mot. at 1-4.  I agree with plaintiffs that this motion is vague and overbroad given that Quest fails to specifically identify the evidence it seeks to exclude.  Quest appears to recognize the same:  many of its other

---

[1] Because I deny this motion for the reasons stated above, I do not consider here Quest's alternative argument that the jury must decide the relevant "article or product" with respect to the Aetna contract, and that the relevant article or product was the complete menu of tests offered under the contract, not each individual test.  *See* Quest Opp. at 4.

2

motions in limine are essentially subspecies of this one – i.e., motions aimed at excluding evidence on the ground that it goes primarily to plaintiffs' previously dismissed claims, not their remaining ones. It may be that most or all of such evidence is inadmissible, but I will not impose a blanket ruling at this time.

### 2. Quest's MIL No. 2: Exclude evidence of accounts not listed in response to Quest's Interrogatory No. 6.

This motion is DENIED. Plaintiffs have established that their nondisclosure of the accounts at issue was both substantially justified and harmless. *See* Fed. R. Civ. P. 37(c)(1).

### 3. Quest's MIL No. 3: Exclude evidence regarding the "Zellernator"

Quest states that plaintiffs may attempt to rely on the "Zellernator," a document identified in plaintiffs' complaint allegedly prepared by John Zeller, a former Quest employee, in 2006 or 2007. Quest Mot. at 3-4. Quest moves to exclude the document on two grounds: (1) plaintiffs "were never able to find any witness knowledgeable about [the] document" and thus "will not be able to lay any foundation for [it];" and (2) the document is not relevant to plaintiffs' remaining claims. *Id.*

Plaintiffs respond that the Zellernator shows that Quest has "historically engaged in below-cost and loss leader pricing [and] has documented the financial benefits of this behavior." Plfs. Opp. at 4. Plaintiffs emphasize that the document "shows that for almost every customer, [Quest] lost money on the discounted capitated rates . . . but made up for those losses with the [fee-for-service] pull through business." *Id.* at 5.

Plaintiffs' opposition to this motion makes clear that the Zellernator is principally relevant to their "pull through" theory – i.e., their theory that they were harmed by Quest's alleged practice of offering below-cost capitated contracts to IPAs for the purpose of obtaining lucrative fee-for-service business. Plaintiffs' claims based on this theory are no longer part of this case. The document's relevance to plaintiffs' remaining claims is highly attenuated at best. In light of this minimal probative value, and the significant potential for unfair prejudice and confusion of the issues, the document is inadmissible under FRE 403. This motion is GRANTED.

### 4. Quest's MIL No. 4: Exclude evidence regarding McKinsey's consulting work for Quest

Quest moves to exclude evidence regarding McKinsey's consulting work for Quest on the ground that the evidence is only relevant to plaintiffs' "client pricing" claims, which were dismissed at summary judgment. Quest Mot. at 6-7. Plaintiffs contend that this characterization of the evidence is inaccurate, and that the evidence is also relevant to Quest's "meeting competition" defense and to plaintiffs' claims arising from the Aetna contract. Plfs. Opp. at 5-6.

This motion is DENIED. Quest cites no material in support of its characterization of the evidence, and plaintiffs have plausibly demonstrated that it remains relevant to the case.

### 5. Quest's MIL No. 5: Exclude "Exhibit 250" to the Valentine deposition

Plaintiffs admit that the data contained in this document concerns only Quest's business with IPAs, not Quest's business with Aetna or Partnership or other similar entities. *See* Plfs. Opp. at 6-8. Accordingly, like the Zellernator, this document is inadmissible under FRE 403 because its minimal probative value is substantially outweighed by the potential for unfair prejudice and confusion of the issues. This motion is GRANTED.

### 6. Quest's MIL No. 6: Exclude testimony of Mike Armstrong

Quest moves to exclude Armstrong's testimony on two grounds: (1) his only personal knowledge regarding Quest's business practices was acquired between 1998 and 2007, long before the initiation of either the Aetna contract or the Partnership contract; and (2) his testimony concerns only the "pull through" theory dismissed at summary judgment. Quest Mot. at 8-9. It is not clear that either of these characterizations is accurate. Plaintiffs state that Armstrong continues to work in the clinical laboratory testing industry, and they cite to excerpts from Armstrong's deposition in which he discusses Quest's business with health insurance providers. Plfs. Opp. at 8-9; Armstrong Dep. at 28 (Lambrinos Decl. Ex. 4, Dkt. No. 332-7). This motion is DENIED.

### 7. Quest's MIL No. 7: Exclude testimony of Diane Exline Van De Beck, Assistant Vice President of National Contracting at Cigna

Quest contends that Van De Beck's testimony is irrelevant because Quest's contract with Cigna "has nothing to do" with plaintiffs' remaining claims. Quest Mot. at 9.

Plaintiffs respond that Quest attempted to introduce "network narrowing" provisions into

its contract with Cigna that were similar to the provision at issue in the Aetna contract. Plfs. Opp. at 9-11. Plaintiffs argue that Van De Beck's testimony regarding the provisions is thus relevant for two purposes: (1) to show that Quest's "pattern and practice" was to introduce such provisions; and (2) to rebut Quest's claim that it was Aetna, not Quest, that wanted the network narrowing provision in the contract. *Id.*

This motion is GRANTED IN PART and DENIED IN PART. Van Der Beck's testimony may be offered for the first purpose. But it may not be offered for the second. In the deposition excerpt cited by plaintiffs, Van Der Beck states that she does not "have a direct recollection" of which party proposed adding the network narrowing provision to the Cigna contract, but that it is "[her] assumption" that Quest proposed it. Plfs. Opp. at 10-11. This assumption is inadmissible under FRE 701 and 403.

### 8. Quest's MIL No. 8: Preclude suggestions that Quest admitted that it took accounts from plaintiffs as a result of Quest's below-cost pricing

During discovery, Quest produced a document listing "accounts that Hunter had at one point [that] subsequently went to [Quest]." Quest Mot. at 9-10. Quest seeks to preclude plaintiffs from suggesting that this list constituted an admission by Quest that it took those accounts from plaintiffs as a result of its below-cost pricing. *Id.* Although plaintiffs dispute that they have ever suggested otherwise, they agree that Quest has not made such an admission. *See* Plfs. Opp. at 11. Accordingly, this motion is GRANTED.

### 9. Quest's MIL No. 9: Preclude arguments that Quest did not disclose information in discovery

Quest states that it "anticipates that plaintiffs may argue that [it] failed to produce relevant information" and moves to preclude such arguments under FRE 402 and 403. Quest Mot. at 10. Quest identifies no particular argument that it expects plaintiffs to make and cites no case or other authority holding that all evidence or argument regarding discovery disputes is per se inadmissible. *See id.* Because this motion is unduly vague and potentially overbroad, it is DENIED.

**10.  Quest's MIL No. 10: Preclude arguments that SPA lost the clinic accounts at a different time than Hunter lost those accounts**

This MIL is somewhat inaptly styled.  Through it, Quest seeks judgment on SPA's UPA claims arising from the Partnership contract on the ground that they accrued before November 14, 2009 and are thus time-barred.  Quest Mot. at 10-12.  Quest contends that it is undisputed both (1) that Hunter's claims arising from the Partnership contract accrued on or around October 1, 2009, when the Partnership contract took effect; and (2) that SPA's damages are wholly derivative of Hunter's damages.  *Id.*  Thus, Quest argues, SPA's claims arising from the Partnership contract must have accrued at the same time as Hunter's – i.e., before November 14, 2009.  *Id.*

Plaintiffs respond that even assuming that SPA's damages are derivative of Hunter's, "this does not mean that they happened at exactly the same time."  Plfs. Opp. at 12.  Plaintiffs state that "while the Partnership contract became effective on October 1, 2009, SPA's damages did not occur until . . . it received its first payment from Hunter that reflected the loss of revenue from these accounts."  *Id.*  Plaintiffs also note that irrespective of whether its UPA claims arising from the Partnership contract are time-barred as a matter of law, its UCL claims arising from the contract (which are governed by a longer, four-year limitations period) are not.  *Id.* at 12-13.

"When applying the one and three year periods of limitation for any continuing violations of the Unfair Practice[s] Act, damages accrue from the date they are suffered and certain." *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 279 n.16 (1983).  "Thus, if [a defendant is] alleged and shown to have committed unlawful acts in 1977 that cause damages in 1979 – when [the plaintiff] went out of business – the latter date is when the applicable period of limitations begins to run."  *Id.*

Since this matter was not raised on summary judgment and since the UCL claims will be presented at trial anyway, I will DENY this motion.  It is unclear to me how SPA will establish that the UPA claims are not time-barred, however.

**11.  Quest's MIL No. 11: Preclude arguments that the capitated rate in the Partnership contract applies to SPA's services**

Quest contends that SPA performs only surgical pathology work, and that such work was expressly excluded from the capitation rate in the Partnership contract.  Quest Mot. at 12.  On this

6

ground, Quest seeks to preclude plaintiffs from arguing that the contract prevented clinics from sending surgical pathology work to SPA. *Id.*

Except for the contract itself, Quest cites no evidence to support its apparent position that, as a matter of law, SPA cannot establish that the Partnership contract prevented clinics from sending it surgical pathology work. *See id.* In light of this near total absence of supporting evidence, this issue remains one for the jury. The motion is DENIED.

**12.  Quest's MIL No. 12: Exclude new evidence or arguments regarding SPA's revenues associated with its four claimed lost accounts**

Quest does not identify any particular "new evidence" that plaintiffs are likely to offer regarding this issue, and I agree with plaintiffs that it would be inappropriate and unwise to grant a MIL "that seek[s] to prophylactically exclude pieces of hypothetical evidence." Plfs. Opp. at 13. This motion is DENIED.

**13.  Quest's MIL No. 13: Preclude SPA from relying on documents referencing only Hunter to establish improper purpose as to SPA**

Quest contends that SPA "should not be able to rely on documents referring only to Hunter [to] show that [Quest] acted with the purpose of harming SPA," unless SPA can establish that "an author or recipient of the document understood the connection between Hunter and SPA." Quest Mot. at 13-14.

Quest cites no authority indicating that to establish that a defendant acted with "the purpose . . . of injuring competitors or destroying competition," *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 169 (1999), a plaintiff must establish that the defendant acted with the purpose of injuring or destroying the plaintiff himself.[2] I find this to be an

---

[2] In the parties' joint proposed jury instructions, Quest cites *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1153-54 (9th Cir. 2008), in support of a proposed jury instruction that would require plaintiffs to prove that "it was [Quest's] conscious object and positive desire to harm [plaintiffs]" to establish improper purpose. *See* Dkt. No. 316 ("Defendants' Proposed Opening Jury Instruction No. 21 – Establishing Purpose"). The court in *Sybersound* did state, "Sybersound must allege that the [defendants'] purpose was to injury Sybersound. Because it has not done so, this claim also fails." 517 F.3d at 1154. But the thrust of the court's analysis was that the plaintiff had alleged only that the defendants *knew* that their conduct would harm their competitors, not that they had the specific *purpose* of doing so, as required under *Cel-Tech*. *See Sybersound*, 517 F.3d at 1153-54 ("The California Supreme Court has held that to violate [the UPA], a generalized understanding or intent that particular conduct will injure competition is insufficient to state a claim; instead, the violator must act with the specific *purpose* of injuring its

7

inaccurate reading of the UPA's below-cost and loss leader pricing provisions and associated case law.  This motion is DENIED.

### 14. Quest's MIL No. 14: Exclude Plandowski's testimony regarding Quest's alleged improper purpose

Plaintiffs' expert, Joseph Plandowski, states in his report that Quest set its pricing with the improper purpose of injuring competitors or destroying competition.  *See, e.g.,* Plandowski Declaration in Support of Plaintiffs' Motion for Summary Judgment ¶ 24 (Dkt. No. 271-22).  Quest moves to exclude this opinion under FRE 702 on the ground that it is not reliable, in that Plandowski "does not identify any methodology" that he applied in reaching it.  Quest Mot. at 14-15.  Plaintiffs respond that the opinion is based on Plandowski's detailed analysis of Quest's prices and costs and his "specialized knowledge" of the clinical laboratory testing industry.  Plfs. Opp. at 15-16.  I agree with Quest that testimony about its alleged improper purpose is not the proper subject of expert opinion from Plandowski, and GRANT this motion.

### 15. Quest's MIL No. 15: Exclude Regan's testimony concerning Hunter's alleged lost business value

This motion is DENIED.  The accuracy of Regan's assumption that BioReference discounted the price it was willing to pay for Hunter because Hunter was no longer in-network with Aetna is a matter for the jury to decide.  Quest may expose this purported flaw in Regan's analysis through cross examination and/or rebuttal evidence.

### 16. Quest's MIL No. 16: Exclude Regan's testimony concerning SPA's damages occurring after Hunter's sale to BioReference

Quest moves to prevent Regan from testifying that SPA's damages extend beyond the date of Hunter's sale to BioReference in August 2013.  Quest Mot. at 17.  Quest points out that Regan cuts off Hunter's damages in August 2013.  *Id.*  It contends that because SPA's damages are derivative of Hunter's, SPA's damages must be cut off in the same way.  *Id.*

---

competition.").  For this reason, I rejected Quest's argument in its motion to dismiss plaintiffs' first amended complaint that, under *Sybersound*, plaintiffs UPA claims failed because they did not allege that Quest "acted with the purpose of injuring *plaintiffs* as opposed to competitors generally."  *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2013 WL 5694452, at *19 (N.D. Cal. Oct. 18, 2013) (internal quotation marks omitted).  Quest offers no grounds – either in its motion in limine or in its proposed jury instruction – to reach a different conclusion now.

Plaintiffs respond that Quest's argument "ignores the fact that the sale of Hunter's assets to BioReference was done in a period of distress. There is no indication that Hunter would have been forced to sell its assets had it not been impacted by [Quest's] conduct." Plfs. Opp. at 17. Thus, plaintiffs argue, "Regan's use of the end of 2013 as a cut-off for SPA's damages under the Partnership [contract] is reasonable in light of the disputed factual issue of whether Hunter would have been forced to sell its assets to BioReference at the time and price that it did but for [Quest's] conduct." *Id.* at 17-18.

This motion is GRANTED. Plaintiffs' argument appears to be a post hoc rationalization of an oversight in Regan's April 22, 2015 expert report. Regan states in the text of the report that he calculated SPA's lost profits "over the period from 2010 to mid-August 2013, inclusive." Regan Rpt. dated 04/22/15 at 24 (Dkt. No. 295-7). Based on the exhibits attached to the report, it appears that he did not impose this limitation when he was actually calculating SPA's lost profits. *See, e.g., id.* at Ex. 4.0. But plaintiffs do not identify any statement by Regan indicating that he did this deliberately, i.e., to reflect the "disputed factual issue of whether Hunter would have been forced to sell its assets to BioReference at the same time and price that it did but for [Quest's] alleged conduct."

Plaintiffs do not identify any evidence at all to support this theory of SPA's damages. Nor do they explain why, if it is inappropriate to cut off SPA's damages in mid-August 2013, it is appropriate to cut them off at the end of December 2013. Testimony concerning SPA's damages occurring after the sale of Hunter's assets to BioReference in August 2013 would be unsupported by the record and are thus inadmissible under FRE 403.

**17.    Quest's MIL No. 17: Exclude evidence and argument regarding prior litigation between the parties**

Quest moves under FRE 402 and 403 to exclude all evidence or argument regarding prior litigation between the parties. Quest Mot. at 17-18. Plaintiffs agree with roughly half of this motion. That is, they agree that evidence of prior litigation between the parties should be inadmissible to show that Chris Riedel is a "serial litigant," but they contend that evidence of the settlement between Quest and the California Attorney General entered in May 2011 at the

9

conclusion of the qui tam action initiated by Hunter should be admissible to show that Quest acted with an improper purpose. Plfs. Opp. at 18-20.

This motion is GRANTED. The probative value of the prior litigation between the parties is far outweighed by its potential to cause unfair prejudice and to confuse the issues. Plaintiffs' theory that the qui tam settlement motivated Quest to target Hunter is not supported by the record. Plaintiffs emphasize that negotiations for the Seventeenth Amendment to the Aetna contract began shortly after the qui tam settlement was announced, and that Hunter is listed on a document produced by Quest which lists "[l]abs originally suggested to Aetna verbally . . . Exclusion Suggestions." Lambrinos 7/10/15 Decl. Ex. 8 (Dkt. No. 332-7). But plaintiffs offer no other evidence to substantiate their claim that Quest targeted Hunter as a result of the qui tam settlement. *See* Plfs. Opp. at 18-20. Absent further substantiation of this connection, the qui tam settlement is not sufficiently probative of improper purpose to avoid exclusion under FRE 403.

**18.    Quest's MIL No. 18: Preclude argument that Aetna terminated four hundred labs as a result of the Seventeenth Amendment to the Aetna contract**

Plaintiffs concede that the facts discovered in this case failed to substantiate this allegation. Plfs. Opp. at 21. They do not oppose the motion, and it is GRANTED.

**19.    Quest's MIL No. 19: Preclude plaintiffs from compelling the live testimony of Quest employees who reside more than one hundred miles from the Court**

This motion appears to reflect a dispute between the parties over whether plaintiffs may present testimony via contemporaneous transmission from witnesses who are beyond the Court's subpoena power under FRCP 45. Construed in this way, the motion is GRANTED.

FRCP 43(a) establishes that, as a general matter, witnesses must deliver their testimony live and in open court. *See* Fed. R. Civ. P. 43(a). "For good cause in compelling circumstances and with appropriate safeguards," the rule also allows testimony "by contemporaneous transmission from a different location." *Id.* But the rule "presupposes a witness willing or compelled to testify at trial." *Roundtree v. Chase Bank USA, N.A.*, No. 13-cv-00239, 2014 WL 2480259, at *2 (W.D. Wash. June 3, 2014). That is, it "does not operate to extend the range or requirements of a subpoena." *Ping-Kuo Lin v. Horan Capital Mgmt., LLC*, No. 14-cv-05202, 2014 WL 3974585, at *1 (S.D.N.Y. Aug. 13, 2014). Where a proposed witness is both unwilling

to testify and beyond the court's subpoena power, the rule does not provide a backdoor means of presenting his or her testimony at trial. *See id.*

The cases cited by plaintiffs do not support a different conclusion. *See, e.g., Beltran-Tirado v. I.N.S.*, 213 F.3d 1179, 1185-86 (9th Cir. 2000) (no indication that out-of-state witness was unwilling to testify); *F.T.C. v. Swedish Match N. Am., Inc.*, 197 F.R.D. 1, 2-3 (D.D.C. 2000) (same); *Official Airline Guides, Inc. v. Churchfield Publications, Inc.*, 756 F. Supp. 1393, 1398 n.2 (D. Or. 1990) (same).

### 20. Quest's MIL No. 20: Preclude argument that Quest has admitted that it sold certain tests in the Aetna contract at below-cost prices

Quest states that plaintiffs "at times have contended that [it] has admitted that it sold certain tests in the Aetna contract at below-cost prices," despite the fact that Quest has not made such an admission. Quest Mot. at 20. Plaintiffs respond that Quest's expert, Vincent Thomas, admits in his expert report that certain tests in the Aetna contract were priced below cost, and that he made the same admission during his deposition. Plfs. Opp. at 23-24.

I agree with Quest that the statements by Thomas cited by plaintiffs are not accurately characterized as admissions to below-cost pricing. Accordingly, this motion is GRANTED to the extent that it seeks to preclude plaintiffs from using those statements as a basis for contending that Quest has admitted to below-cost pricing in the Aetna contract. This ruling in no way precludes plaintiffs from otherwise introducing or relying on the statements.

### 21. Quest's MIL No. 21: Preclude plaintiffs from claiming additional recovery under the UCL

This motion is DENIED. Even assuming that plaintiffs would not be entitled to restitution under the UCL if they prevailed on those claims, plaintiffs could still be entitled to an injunction. *See* Cal. Bus. & Prof. Code § 17203 ("The court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes

11

1  unfair competition.").

2  **IT IS SO ORDERED**.

3  Dated: July 16, 2015



WILLIAM H. ORRICK
United States District Judge